IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

ASHEVILLE DIVISION

| | | |
|---|---|---|
| Buddy J. Jones, | ) | Civil Action No. _____ |
|       Plaintiff, | ) | |
| vs. | ) | **COMPLAINT** |
| Albemarle Corporation, | ) | **(Jury Trial Demanded)** |
|       Defendant. | ) | |

Plaintiff, Buddy J. Jones, by way of his Complaint in this matter, would respectfully show unto this Honorable Court the following:

### I. Parties, Jurisdiction, and Venue

1. Plaintiff is a citizen and resident of Cleveland County, North Carolina.

2. Upon information and belief, Defendant, Albemarle Corporation (hereinafter "Defendant" or "Albemarle"), is a limited liability company organized and existing pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in the State of North Carolina. Defendant owns property and conducts business within Cleveland County, South Carolina.

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343, because this action is based on race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and under 42 U.S.C. § 1981. The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiff's claim under the common law of the State of North Carolina because that claim is so related to Plaintiff's claim for race discrimination that it forms part of the same case or controversy as the federal claims asserted herein.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Defendant does business in this judicial district and division, and the unlawful employment practices giving rise to Plaintiff's claims were committed within this judicial district and division.

## II. Facts

5. Plaintiff began working for Defendant on or about September 11, 2017, as an Off-Site Warehouse Coordinator for Defendant's facilities in Kings Mountain, NC. He successfully trained on the SAP System in Baton Rouge, LA and Dallas, TX for approximately six months and received a "Meets Expectations" on his first performance evaluation in early 2018, along with a pro-rated bonus for 2017.

6. In or about mid-March 2018, Plaintiff was assigned to the Ignite Project in Baton Rouge, which required him to be away from his home Monday through Thursday, for over seven months. Unfortunately, Plaintiff was not provided adequate guidance or directives about his job assignment in Baton Rouge, which was materially different than the position for which he was hired and received training. In late October 2018, Plaintiff was notified by his supervisor that he (Plaintiff) would be transferred back to Kings Mountain and would switch job responsibilities with the supervisor, who was taking over for him in Baton Rouge. Plaintiff received a "Below Expectations" performance rating for 2018, allegedly due to poor performance in Baton Rouge, despite the facts that he was never provided with a reasonable opportunity to succeed in this new position and that he was unexpectedly required to spend 80% of his work weeks away from his home and family.

7. Plaintiff returned to the Kings Mountain facility at the end of October 2018. In January 2019, Plaintiff was assigned responsibility for inventory management for the first time. Plaintiff was called into a meeting on or about January 2, 2019, with a Supply Chain Analyst,

Ammie Hintze, and a co-worker, Stephane Vercheure, who was previously responsible for transferring inventory from an old system to an new system. Mr. Vercheure asked Ms. Hintze to explain a large discrepancy in the company's inventory for Spodumene. Ms. Hintze explained to Mr. Vercheure that the inventory amount on the records was incorrect and that the material in question was not physically located in the facility. Plaintiff helped Ms. Hintze to mark up a spreadsheet that Mr. Vercheure had provided to them, and they sent the corrections regarding the inventory to Mr. Vercheure.

8. In mid-February 2019, during an audit of the inventory as of December 31, 2018, the discrepancy was again raised by any auditor from Price Waterhouse Coopers. Defendant's Director of Finance instructed Plaintiff not to do anything yet with the Spodumene inventory until further instructions, which never happened.

9. In September 2019, the issue of the Spodumene inventory was raised again. At that time, Plaintiff was instructed to write off approximately $2 million in missing inventory. Because Plaintiff's name was on the write-off, he was unfairly blamed for the inventory discrepancy, despite the fact that the discrepancy apparently arose in the 2014-15 time frame, over two years before Plaintiff first became employed by Defendant. The system glitch that apparently caused the overstatement of inventory was discovered by Ms. Hintze in 2017, well before Plaintiff had any responsibility for inventory.

10. Plaintiff repeatedly pushed back against the company's effort to blame him for the write-off and how the write-off was handled and eventually reported. Plaintiff is informed and believes that the inventory write-off, which was delayed for almost two years, had a material impact on Defendant's reported financial performance.

11. On or about December 17, 2019, Plaintiff was placed on a Performance Improvement Plan ("PIP"), primarily relating to the inventory issue described herein. During the meeting to discuss the PIP with his supervisor and a representative of Defendant's Human Resources Department, Plaintiff's supervisor stated that he had received complaints about Plaintiff from the plant, but would not provide any details about the nature of the complaints. Plaintiff also requested a copy of his job description, because the PIP had a different job title (Senior Warehouse Specialist) than the position for which he was hired (Off-Site Warehouse Coordinator). Human Resources stated that they were "working on" his job description.

12. Plaintiff was fired on or about January 22, 2020, several weeks before the 60-day end date specified in the PIP, without cause. Plaintiff was gratuitously fired in full view of the people with whom he worked during lunchtime. He was forced to stand in the busiest part of the building and wait for his personal effects to be brought to him by the HR Manager.

13. At the time of his termination, Plaintiff was earning a base salary of approximately One hundred, three thousand dollars ($103,000.00) per year, plus full benefits.

**FOR A FIRST CAUSE OF ACTION**
**(Race Discrimination–Title VII and 42 U.S.C. § 1981)**

14. Plaintiff repeats and realleges Paragraphs 1-13 as if restated verbatim.

15. Plaintiff has exhausted all administrative remedies necessary to file suit under Title VII for race discrimination. Specifically, Plaintiff filed a charge of race discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") on or about June 11, 2020, within one-hundred eighty (180) days of the discriminatory actions. The EEOC issued a right-to-sue letter to Plaintiff, which letter was dated and mailed on or about August 26, 2020. Plaintiff

is filing this action within ninety (90) days of his receipt of the right-to-sue letter.

16. Plaintiff is African American.

17. Plaintiff was one of very few African-American employees of Defendant in a salaried, exempt managerial position.

18. Defendant unlawfully discriminated against Plaintiff, based on his race, by treating him differently than other similarly situated non-black employees. For example, the Caucasian employee who was primarily responsible for the inventory discrepancy described above issue was not disciplined or terminated for her involvement; yet, Plaintiff was placed on a PIP and later fired. In addition, upon information and belief, contemporaneously with the inventory discrepancy for Spodumene, Defendant discovered an inventory discrepancy of approximately $3 million in the company's Dallas warehouse, which was also caused in the transition to the new inventory system. No employee was terminated from the Dallas facility relating to that discrepancy.

19. Defendant's discriminatory actions as alleged above also impaired Plaintiff's ability to make and enforce contracts regarding the terms and conditions of his employment, based on his race, in violation of 42 U.S.C. § 1981.

20. Upon information and belief, any alleged reason proffered by Defendant for placing Plaintiff on a PIP or for terminating his employment is a pretext for unlawful discrimination.

21. Defendant's unlawful discrimination against Plaintiff has directly and proximately caused him to suffer actual damages in the form of lost wages and employment benefits, emotional distress, humiliation, embarrassment, and loss of enjoyment of life. Accordingly, Plaintiff is entitled to recover in this action actual damages from Defendant sufficient to compensate him for lost wages and employment benefits and emotional distress caused by Defendant's unlawful discrimination.

22. Upon further information and belief, Defendant's discrimination against Plaintiff was intentional and in reckless disregard of his rights to be free from such discrimination. Therefore, Plaintiff is entitled to recover punitive damages against Defendant, in an amount to be determined by the jury, sufficient to deter this Defendant and others from engaging in such discriminatory actions in the future.

23. Plaintiff is also entitled to an award of reasonable attorney's fees, expert fees, and costs incurred in bringing this action.

## FOR A SECOND CAUSE OF ACTION
### (Breach of Contract)

24. Plaintiff repeats and realleges Paragraphs 1-23 as if restated verbatim.

25. Defendant made written offer of employment to Plaintiff, which included three weeks' paid vacation as one of the job-related benefits.

26. Plaintiff accepted Defendant's offer letter, thereby creating a contract of employment.

27. The contract of employment between Plaintiff and Defendant was supported by good and valuable consideration from both Plaintiff and Defendant.

28. After Plaintiff started working for Defendant, Defendant unilaterally reduced the amount of paid vacation to one week.

29. Plaintiff was never allowed to take all of his paid vacation, because Defendant always told Plaintiff that he did not have any back-up available.

30. In 2018, Plaintiff lost one week of unused vacation pay because it was not carried over to 2019.

31. Defendant breached its employment contract with Plaintiff by not providing him with

6

the full amount of vacation pay as promised in his offer letter and by informing Plaintiff that no back-up was available to allow him to take his vacation.

32. As a direct and proximate result of Defendant's breach of contract, Plaintiff has suffered the lost value of his paid vacation. Plaintiff is entitled to an award of actual damages to compensate him for the economic value of this employment benefit.

WHEREFORE, having fully set forth his allegations against Defendant, Plaintiff respectfully requests the following relief:

    a. Back pay, front pay, lost employment benefits, and interest thereon;

    b. Compensatory damages for other economic losses directly and proximately caused by Defendant's unlawful conduct;

    c. Punitive damages;

    d. Pre-judgment interest;

    e. Enhancement to Plaintiff's actual, economic damages to account for any negative income tax consequences Plaintiff might sustain from receiving a damages award in a lump sum;

    f. Attorney's fees, expert fees, and costs; and

    g. Such further relief as the Court deems just and appropriate.

[Signature of Counsel on Following Page]

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL.**

                                    s/ David E. Rothstein
                                  David E. Rothstein, NC Bar No. 37825
                                  ROTHSTEIN LAW FIRM, PA
                                  1312 Augusta Street
                                  Greenville, SC 29605
                                  (864) 232-5870 (office)
                                  (864) 241-1386 (facsimile)
                                  drothstein@rothsteinlawfirm.com

                                  Attorney for Plaintiff, Buddy J. Jones

November 25, 2020

Greenville, South Carolina.